## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO


ANDREW J. THOMSON,

      Plaintiff,

v.                                   No. 1:17-cv-00565-JCH-JFR

NATIONAL RAILROAD
PASSENGER CORPORATION,
*doing business as* AMTRAK,

      Defendant.


### MEMORANDUM OPINION AND ORDER

This matter is before the Court on: Defendant National Passenger Corporation's (Amtrak) Motion for Summary Judgment **(ECF No. 90)**; Amtrak's Motion to Exclude the Testimony of Dr. Julia Johnson, EDD, LEP **(ECF No 87)** and Amended Motion to Exclude the Testimony of Dr. Julia M. Johnson Regarding Causation **(ECF No. 169)**; Amtrak's Motion to Exclude the Testimony of Dr. Michael D. Roback, M.D. **(ECF No. 88)**, Renewed Motion to Exclude Dr. Michael D. Roback, M.D.'s Supplemental Orthopaedic Report and Corresponding Testimony **(ECF No. 162)** and Motion to Strike Dr. Roback's Declaration as moved for in **(ECF No. 103)**; Amtrak's Motion to Strike Dr. Roback's Second Declaration **(ECF No. 167)**; Amtrak's Motion to Strike Plaintiff's Declaration, as moved for in **(ECF No. 109)**; and Plaintiff's Federal Rule of Civil Procedure 56(d) Motion as moved for in **(ECF No. 99)**.

I.      **BACKGROUND**

### A. Summary Judgment Material Facts

The Court presents the following material facts in the light most favorable to Plaintiff as the summary judgment nonmovant. *See DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 961 (10th Cir. 2017). In May 2014, Plaintiff was a passenger on an Amtrak train that was passing through New Mexico. Amtrak's Undisputed Material Fact ¶ 1, ECF No. 90 (Amtrak's UF); Declaration of Andrew J. Thomson ¶ 3, ECF No. 101 (Thomson Decl.). Plaintiff had a private cabin with its own bathroom. *Id*. The train was re-routed or rescheduled at least two to three times. *Id*. at ¶ 6. In texts, emails, and calls explaining the re-routing decisions, Amtrak cited "unscheduled maintenance and rail repair." *Id*. Plaintiff experienced a "rough ride" while in New Mexico and significant bumps or jolts roughly every 15 minutes during travel through hilly terrain. *Id*. at ¶¶ 6, 7. Amtrak made PA announcements in a "serious tone" telling passengers to "keep all kids from running around" and warned that "G forces from the train riding on the rails can be sufficient to throw a grown man through the air." *Id*. at ¶ 8; Deposition of Andrew J. Thomson, 127:20-25 – 128:1, ECF No. 90-4 (Thomson Depo.).

Around Springer, New Mexico Plaintiff was sitting down using the bathroom in his private cabin (Room B of Unit 32068) when the train jolted, causing him to be "thrown off the toilet and knocked unconscious when [his] head hit the bathroom door." Thomson Decl. at ¶ 9. When Plaintiff regained consciousness, he was face down on the bathroom floor and the toilet shroud was on the back of his legs. *Id*. at ¶ 12. He inspected the shroud and saw that the bolt-holes were empty where the shroud would normally attach to the rest of the toilet and the wall. *Id*. at ¶ 13. Plaintiff photographed the shroud as he found it.[1] *Id*. at ¶ 14. This was the first time

---

[1] Amtrak states that Plaintiff's photograph in fact "shows two bolts in place," Amtrak's UF at ¶ 14, and that the bolts are "clearly show[n]." ECF No. 109, 5. Although a summary judgment nonmovant's account that is "blatantly contradicted by the record" so that "no reasonable jury could believe it," should not be adopted, *Scott v. Harris*, 550 U.S. 372, 380 (2007), this principle has no application here. The photograph is devoid of necessary context to understand what it

that Plaintiff used the toilet; he never manipulated or altered the toilet before the accident. *Id*. at ¶¶ 11, 17.

Conductor Estevan Montoya and another employee came to the room. *Id*. at ¶ 18. Montoya told the employee to move Plaintiff to another room because the toilet was broken and needed repairs. *Id*. at ¶ 20. Montoya testified at a later deposition that the toilet was "on its side" and "not on its usual position." Deposition of Estevan Montoya, 38:1-2, ECF No. 90-6 (Montoya Depo.). In a post-accident report, Plaintiff described his version of the accident as follows: "Toilet not attached to wall. Sat on it, train hit a bump, whole toilet flew off." ECF No. 101, 12.

Plaintiff explained to Montoya and the other employee that he had suffered a previous head injury and that his doctor told him that if he ever had another head injury he should go to an emergency room, and that he was disoriented and felt dizzy. Thomson Decl. at ¶ 21. Rather than stopping at the nearest station, Las Vegas, New Mexico for medical treatment, Amtrak proceeded roughly 17-hours to Los Angeles. *Id*. at ¶ 22. In a post-accident report authored by Montoya, Montoya minimized Plaintiff's damages by writing that Plaintiff did not lose consciousness and that Plaintiff declined medical treatment and "want[ed] to wait till LAX." ECF No. 101 at 11; Thomson Decl. at ¶ 25.

Once in Los Angeles, an Amtrak employee in a golf cart retrieved Plaintiff and he was taken to the emergency room. *Id*. at ¶ 24. The ER records, dated the day after Plaintiff's incident, stated that Plaintiff did not suffer obvious injuries and that he was alert and oriented. Amtrak's UF at ¶ 16; ECF No. 90-12, 1. The records noted no loss of consciousness, vertigo, vision changes, dysphagia, dysarthria, numbness/tingling, or neck/back pain. *Id.* at 4.

---

depicts, thereby requiring resolution by the factfinder. In addition, the Court denies Amtrak's motion to strike Plaintiff's declaration statement that he observed empty bolt-holes because it supposedly conflicts with the photograph. Again, what the photograph depicts – which is far from clear – will go to the jury.

The parties submitted the testimony of deposed Amtrak employees who testified about the circumstances of the accident. Conductor Montoya testified that no slow orders or track defect bulletins existed in the area where the accident occurred. Montoya Depo. at 29:8-17. Concerning the cause of a toilet shroud coming off, Assistant Superintendent Ilene Lara testified that one would "actually have to lift that shroud up and pull it out for it to come out." Deposition of Ilene Lara, 61:1-2, ECF No. 90-7 (Lara Depo.). She stated that she had "never seen in all my time here … [s]omething like that. Maybe if the train de[r]ailed, maybe it can come off, but [she had] never seen anything like that." *Id*. at 61:3-7. Foreman Homer Yonan said he had never seen a toilet shroud completely detach. "I don't … have any explanations for it, other than in my view it has to lifted out, it has to be pulled vertically out and towards you to remove it. And the two screws that hold the … face plate down, would have to be removed." Deposition of Homer Yonan, 64:19-23, ECF No. 90-8 (Yonan Depo.). And Maintenance Technician Amgad Abdelmalak testified that even if two screws were missing from the front, other design features of the toilet would prevent the toilet shroud from detaching. Deposition of Amgad Abdelmalak, 69:13-25 – 70:1, ECF No. 90-9 (Abdelmalak Depo.).

In addition to these employees' depositions, the parties submitted competing inspection reports and other train documents that Amtrak maintains. For instance, Amtrak's inspection reports from the day Plaintiff boarded the train and the week prior showed that employees inspected the "lavatories" in Unit 32068 and that no toilet shroud defects were noted in Plaintiff's unit. ECF Nos. 90-2, 1-2; 90-3, 1-2. However, drawing inferences in Plaintiff's favor, these inspection reports only note that the lavatories generally – as opposed to the toilet specifically – were inspected.

4

For Plaintiff's part, he submitted repair orders generated from before, and the day of, the accident, which indicated repair issues with the toilet shroud. For instance, an order generated about a month before the accident stated: "Room B Toilet Shroud Loose," and required corrective action. ECF No. 100, 14.; *id*. at 18. And a work order created on the day of his accident, May 26, 2014, said: "Rm B toilet fixture is broken." *Id*. at 8.

### B. Background Concerning Dr. Michael D. Roback

### 1. Dr. Roback's Credentials

In May 2017, Plaintiff filed a one-count complaint for negligence against Amtrak. Plaintiff offered reports and other materials from two experts to support his theories: Dr. Michael D. Roback, a doctor and former orthopedic surgeon who intends to testify that Amtrak caused Plaintiff's orthopedic surgeries and about Plaintiff's medical damages; and Dr. Julia M. Johnson, a licensed educational psychologist, who intends to testify that Plaintiff has a traumatic brain injury caused by the train accident.

Dr. Roback currently practices medicine in Ventura, California. Résumé/Curriculum Vitae of Dr. Michael D. Roback, ECF No. 97-1, 3 (Roback CV). He holds bachelor and medical degrees from the University of California. *Id*. at 2-3. Dr. Roback has practiced medicine since at least 1972. *Id*. at 5. He was the chief of surgery at Beverly Glen Hospital from 1975 to 1979 and director of orthopaedics at Bear Valley Hospital during this same time. Second Declaration of Dr. Michael Roback, ¶ 5, ECF No. 163-1 (2nd Roback Decl.). He has been a member of numerous professional societies and was awarded a diplomate from the American Board of Orthopaedic Surgery in 1974. Roback CV at 2, 12-13. Over his career the doctor has authored medical articles and given medical presentations. *Id*. at 5-12.

From 1990 to 2004, Dr. Roback served on California's industrial medical council, which established policies and procedures to address work-related injuries, evaluation, treatment, and costs for medical care. 2nd Roback Decl. at ¶ 6. The council developed a test to qualify individuals as expert witnesses and acted as a judicial body to handle complaints against doctors for overbilling and other malfeasances. *Id*. Since 1990, Dr. Roback has also served as a qualified medical evaluator for California's workers' compensation division and in that capacity is specialized to examine individuals and make costs-of-treatment determinations. *Id*. at ¶ 7. Since 1989, he has also served as an independent medical examination for California's workers' compensation appeals board and has been involved in hundreds of cases in cost-of-treatment cases. *Id*. at ¶ 8.

### 2. Dr. Roback's Medical Diagnoses and Causation Opinions

Dr. Roback generated a 32-page expert report based on a January 2018 orthopedic evaluation of Plaintiff. Dr. Roback's Expert Report, ECF No. 97-2 (Roback Report). The report began by summarizing Plaintiff's "current condition," which appears to be based on Plaintiff's oral history of the train incident and medical events following the incident. *Id*. at 2-4. After this summary, Dr. Roback listed Plaintiff's medical records that he reviewed, including x-ray and MRI imagining, for different parts of Plaintiff's body. *Id.* at 4-10. The report noted that Plaintiff "had a car accident in 2009 …. [Plaintiff] had neck and back symptoms with normal imagining …. Imaging studies head and neck negative." *Id*. at 10. The report then described Plaintiff's employment history and social activities and summarized the limitations on Plaintiff's life activities following the train incident, such as his reduced ability to do domestic work, physical exercise, etc. *Id*. at 10-13.

Dr. Roback's report then summarized Plaintiff's description of the pain he feels in his neck, right shoulder, upper extremity, chest, thoracic and lumbar regions, and knees. *Id*. at 14-17. Dr. Roback's report then relayed the results of his physical examination of Plaintiff. The examination included manipulating and palpating Plaintiff's limbs and joins and testing his flexion, pain levels, and strength. Declaration of Dr. Roback, ¶ 13, ECF No. 97 (Roback Decl.). Dr. Roback conducted a Tinel's test on the wrist to test nerve irritation and a Phelan's test which involves compressing the wrist's nerve. Deposition of Dr. Roback, 98:12-19; 99:10-18, ECF No. 96-1 (Roback Depo.).

Dr. Roback concluded in his report that Plaintiff is "100% permanently disabled" and recommended future medical treatment for various afflicted body parts. Roback Report at 33; *id*. at 32-33. Concerning Plaintiff's right shoulder, the doctor wrote that "[i]n the 3½ years since the accident, the patient's right shoulder has undergone deterioration in addition to the initial damage to the AC joint and rotator cuff" and predicted that Plaintiff will eventually need a total joint replacement. *Id*. at 32. Concerning Plaintiff's neck, Dr. Roback reported "malposition of the C7 vertebra on the T1 vertebra associated with narrowing of the foramen," a "small disc herniation of the disc just above C7," and stated that Plaintiff will require neck surgery. *Id*. Plaintiff's back, a "major problem," with "disc herniation encroaching on the right S1 nerve root," would also likely require surgery. *Id*. Ligamentous repair for Plaintiff's right wrist was recommended. *Id*. Surgery could not improve damage to Plaintiff's right knee, so Dr. Roback recommend symptomatic treatment. *Id*. at 33. He attributed Plaintiff's injuries to his neck, back, right extremity and right knee to Amtrak. *Id*. at 31.

Amtrak deposed Dr. Roback about other injuries he was aware besides the train incident. He responded that he was aware that Plaintiff had a 2009 car accident, which "appeared to be a

big accident, particularly with reference to his head," but that it did "not appear that [Plaintiff] had any functional limitations or significant symptoms and maintained his life activities pretty much until the Amtrak [accident]." Roback Depo. at 84:6-18. Dr. Roback did not see "ongoing treatment for [Plaintiff's] neck or his back," in medical records, which Dr. Roback believed correlated with Plaintiff's statement to Dr. Roback that Plaintiff had only "minor problems" in the years following the 2009 car accident. *Id*. at 84:25-86:1-5. He stated that just because Plaintiff "had an accident in the past doesn't mean he's going to have symptoms." *Id*. at 127:21-22. In terms of excluding the 2009 accident as a potential cause of Plaintiff's injuries, Dr. Roback stated, "You've got to show me something that gives me some idea that at least something was happening before [the train] accident for me to say something other than the [train] accident was the cause." *Id*. at 127:25-128:1-3.

Concerning disc herniation, Dr. Roback excluded Plaintiff's age or weight as causes of that ailment. *Id*. at 122:10-25-123:1-5.[2] Concerning Plaintiff's right injury shoulder, Dr. Roback stated that the train accident caused that injury because a 2017 MRI taken roughly three years after the accident "show[ed] the most damage." *Id*. at 137:11-12. He stated that Plaintiff's AC joint had "degenerated because of the trauma" and had fluid in the area, which is more common with newer injuries than older ones. *Id*. at 137:9-17. Because Plaintiff had not engaged in activities that could result in shoulder damage, such playing football, lifting weights, or working as a jackhammer operator, Dr. Roback concluded that the shoulder injury was traumatic in origin. *Id*. 138:11-21.

---

[2] Plaintiff states that Dr. Roback ruled out age and weight as causes of Plaintiff's "injuries" generally. ECF No. 96 at 8. But the deposition transcript shows that Dr. Roback only discussed age and weight in the context of disc herniation and not in the context of other injuries.

To counter Dr. Roback's claim that Plaintiff did not have functional limitations before the train incident, Amtrak tendered several of Plaintiff's medical records which noted orthopedic and other injuries. The medical records surrounding the 2009 car wreck stated that Plaintiff complained of mild head, neck and left shoulder pain, Def.'s Ex. 3, 1, ECF No. 88-3; Ex. 4, ECF No. 88-4, although a CT scan of Plaintiff's brain was within normal limits and a CT scan of his cervical spine was unremarkable. Def.'s Ex. 5, ECF No. 88-5, 1. A medical record from 2010 attributed cervical radiculopathy and cervical and lumbar strain to the 2009 accident. *Id.* at 3. March and April 2014 medical records noted back pain and an MRI showed a bulging disc in Plaintiff's spine. Def's. Ex. 9, ECF No. 88-9, 1; Ex. 10, ECF No. 88-10. In January 2014, Plaintiff sought medical treatment for his legs, hypertension, traumatic brain injury, and chest pain. Def.'s Ex. 6, ECF No. 88-6, 1. On May 1, 2014 – weeks before the accident – the "diagnosis" section of Plaintiff's record stated: "[Herniated Nucleus Pulposus] Lumbar Spine" and "(R) Clavicular Pain." Def.'s Ex. 11, ECF No. 88-11. In addition, Plaintiff's records from his local provider consistently listed lumbago, hypertension and pain as "chronic problems." Def.'s Ex. 7, ECF No. 88-7, 2; Ex. 8, 1, ECF No. 88-8; Ex. 9 at 2; Ex. 12, 1-2, ECF No. 88-12.

Amtrak also tendered post-train incident medical records. On June 2, 2014 Plaintiff sought medical treatment for left thumb pain from a previous cat bite. Def.'s Ex. P, ECF No. 90-16, 1. On June 14, 2014 he sought emergency treatment for a swollen thigh. In 2015, Plaintiff sought emergency medical treatment for right foot swelling and for a head injury after hitting his head on a metal shelf and briefly losing consciousness. Def.'s Ex. N, ECF No. 90-14, 1. And in a separate 2015 medical record, Plaintiff told the medical attendant that his chronic neck and lower back pain started twenty years ago after being struck by a truck while he was riding a bicycle. Def.'s Ex. D, ECF No. 90-16, 9.

After he filed his expert report and was deposed, Dr. Roback submitted a declaration in opposition to Amtrak's *Daubert*[3] motion. He stated that he conducted a differential diagnosis, which is the process for determining the likely cause of an injury. Roback Decl. at ¶ 14. After considering other potential causes of Plaintiff's injuries, including the 2009 car accident, Dr. Roback determined to a "reasonable medical probability" that Amtrak caused Plaintiff's injuries. *Id*. He stated that post-incident imaging showed ailments that "were not present before[ ] and do not have any other reasonable explanation other than they were likely caused by the Amtrak incident." *Id*. at ¶ 15. He also stated that "an Amtrak train weighs a substantial amount, and when traveling with passenger cars at regular speeds is capable of generating great force," sufficient for Plaintiff to lose consciousness after allegedly hitting his head on the bathroom door. *Id*. at ¶ 16. He viewed "the photos of the toilet component on the ground after the incident, leading [him] to believe sufficient force was generated for the component to come unattached to the rest of the toilet," and repeated his belief that it is reasonably probable that Amtrak caused Plaintiff's injuries. *Id*.

### 3. Dr. Roback's Opinions on Medical Damages

On August 12, 2019 Dr. Roback generated a supplemental report projecting thousands of dollars of costs for treatment for Plaintiff's future medical care. Supplemental Orthopaedic Report by Dr. Michael Roback, 2-3, ECF No. 162-1 (Supp. Roback Report). When asked in his deposition what sources of information he reviewed in producing his report, the doctor answered that as a state official "working with work injuries, industrial accidents," he could access insurance companies' billing and payment systems. June 2020 Deposition of Dr. Michael D. Roback, 31:7-19, ECF No. 162-3 (June 2020 Roback Depo.). Using insurance databases, he

---

[3] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

"looked at what was billed and what was paid in regular insurance," and generated average treatment costs for Plaintiff's projected medical treatments. *Id*. at 32:3-5; 54:8-13.

## II.    PROCEDURAL HISTORY

Amtrak moved to exclude Plaintiff's expert witnesses, Drs. Johnson and Roback, and has moved for summary judgment. In July 2020, the Court partially ruled on Amtrak's *Daubert* challenge to Dr. Johnson. *See* Mem. Op. and Order, ECF No. 155. Specifically, the Court ruled that Dr. Johnson could testify as an expert about the diagnosis of traumatic brain injury (TBI) and associated cognitive impairments. However, although Dr. Johnson diagnosed Plaintiff's condition, she did not state in her expert report that Amtrak caused Plaintiff's cognitive injuries. Only in a later filed declaration – which Amtrak moved to strike as an untimely expert disclosure – did she draw a causal connection between the train incident and Plaintiff's mental injuries.

The Court denied the motion to strike. Given that expert discovery was already reopened for issues related to Dr. Roback's damages opinions, the parties were ordered to re-depose Dr. Johnson during the same period of reopened expert discovery.

The summary judgment and *Daubert* records are now complete and the motions are ripe for disposition. Before turning to those motions, however, the Court must rule on several procedural or evidentiary motions filed primarily by Amtrak.

## III.    DISCUSSION

### A. Plaintiff's Rule 56(d) Motion

Amtrak's post-accident repair order indicated that an Amtrak employee named Mr. Abdelmalak repaired the toilet. ECF No. 100 at 8. But when deposed, Mr. Abdelmalak indicated that another individual – an unidentified employee – had already put the toilet shroud back in place before Mr. Abdelmalak arrived. Declaration of Derek C. Decker, ¶ 11, ECF No. 100 (Decker Decl.). Based on this new information about the unidentified repairperson, Plaintiff

moved under Federal Rule of Civil Procedure 56(d) to defer or deny ruling on Amtrak's summary judgment motion until the repairperson can be identified. Plaintiff's attorney says that the repairperson "could provide critical insight into why the toilet broke in the first place," why it lacked bolts, "and why and how it was repaired." *Id.* at ¶ 14. He also seeks "any and all records reflecting this individual's work on repairing the toilet, or relating to [the individual's] identity." *Id.* at ¶ 13.

Amtrak responds that the employee's identity is unknown despite its efforts to identify him or her.

**1. Standard of Review**

Federal Rule of Civil Procedure 56(d) allows a court to deny or defer considering a motion for summary judgment where the "nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition." Fed. R. Civ. P. 56(d). "In this circuit, a party seeking to defer a ruling on summary judgment under Rule 56([d]) must provide an affidavit "explain[ing] why facts precluding summary judgment cannot be presented." *Valley Forge Ins. Co. v. Health Care Mgmt. Partners, Ltd.*, 616 F.3d 1086, 1096 (10th Cir. 2010) (citation and internal quotation marks omitted). "This includes identifying (1) the probable facts not available, (2) why those facts cannot be presented currently, (3) what steps have been taken to obtain these facts, and (4) how additional time will enable [the party] to obtain those facts and rebut the motion for summary judgment." *Id.*

**2. Analysis**

Plaintiff's Rule 56(d) motion is denied. The parties agreed to extend the discovery deadline numerous times with a final deadline of November 8, 2018. Plaintiff learned during Mr. Abdelmalak's September 25, 2018 deposition that he was not the repair employee. With over a

month remaining to conduct discovery, Plaintiff filed no motion to compel discovery into the individual's identity or to extend the discovery deadline. Given that Plaintiff did not use discovery tools during the available period to do so, Plaintiff has failed to show that a lack of discovery prevents him from presenting facts essential to justify his opposition. Moreover, Amtrak tried to identify the person but was unsuccessful despite its efforts. Amtrak cannot disclose what it does not know.

### B. Amtrak's Motion to Strike Plaintiff's "Sham" Declaration

Plaintiff executed his own declaration after, and in response to, Amtrak's motion for summary judgment. Amtrak claims that Plaintiff's declaration contains "self-serving testimony insufficient to create a genuine issue of material fact" and asks the Court to strike the entire declaration. ECF No. 109 at 5.

### 1. Standard of Review

Contradictions in a witness's testimony do not, without more, justify preclusion of that testimony. *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 973 (10th Cir. 2001). A subsequent affidavit "'may not be disregarded [merely] because it conflicts with the affiant's prior sworn statements.'" *Id.* (quoting *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986)). But a court may be justified in disregarding a contrary affidavit when the affidavit constitutes an attempt to create "'a sham fact issue.'" *Id.* (quoting *Franks*, 796 F.2d at 1237). "To determine whether a contradicting affidavit seeks to create a sham fact issue, [courts] have looked to three factors: whether: '(1) the affiant was cross-examined during his earlier testimony; (2) the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence; and (3) the earlier testimony reflects confusion which the affidavit attempts to explain.'" *Id.* (quoting *Rios v. Bigler*, 67 F.3d 1543, 1551 (10th Cir. 1995)). When consideration of these factors leads to the conclusion that the subsequent affidavit

13

constitutes an attempt to create a "sham fact issue," the court does not abuse its discretion in disregarding the affidavit and relying instead on the prior deposition testimony in deciding a summary judgment motion. *Franks*, 796 F.2d at 1237; *Ralston*, 275 F.3d at 973.

### 2. Analysis

Amtrak moves to strike Plaintiff's entire declaration. The Court limits its analysis only to the portions of the declaration that Amtrak specifically identifies as problematic.

First, Amtrak claims that Plaintiff exaggerated the severity of the bumps and jolts during the journey when compared to his deposition. *Compare* Thomson Depo. at 158:24-25 (Plaintiff stating that "there was [sic] bumps and rough rides throughout the entire journey"), *with* Thomson Decl. at ¶ 7 (Plaintiff stating that "there were significant bumps and jolts roughly every fifteen minutes or so.") These statements are not so inherently in conflict that excluding the declaration is required.

Second, Amtrak contends that Plaintiff has no "objective information" to opine that Amtrak to "us[es] a policy of deferred maintenance," Thomson Decl. at ¶ 7, which resulted in the poor track condition. The Court will exclude this portion of Plaintiff's declaration because Plaintiff lacks personal knowledge to make these statements and the statements likely exceed the bounds of lay testimony. Plaintiff's opinion about Amtrak's maintenance policies is excluded.

Third, Amtrak claims that Plaintiff's statement that "the Conductor should have stopped the train as soon as possible (Las Vegas [sic] New Mexico was the next stop and not far away) so I could get medical attention … instead of … proceed[ing] all the way to Los Angeles," Thomson Decl. at ¶ 22, contradicts the post-incident report, which "shows [Plaintiff] declined treatment to wait until Los Angeles." ECF No. 109 at 6. But it appears that Conductor Montoya authored the post-incident report, and Montoya's statements are genuinely disputed. Weighing

the witness's statements is reserved for the trier of fact. Amtrak next claims that Plaintiff's declaration conflicts with his deposition statement about attaining treatment "in a 'big city.'" ECF No. 109 at 5-6. However, Amtrak pointed to no contradictory deposition testimony showing that Plaintiff directed employees to take him to Los Angeles. There is no conflict between Plaintiff's declaration and his deposition, so Amtrak's request is denied.

Fourth, and relatedly, Amtrak claims that Plaintiff's declaration that Amtrak should have stopped as soon as possible instead of "proceed[ing] all the way to Los Angles, a roughly seventeen-hour ride," Thomson Decl. at ¶ 22, contradicts his deposition statement that the train made "multiple stops" before arriving in Los Angeles. *See* Thomson Depo. at 232:4-5. There is no inconsistency.

Fifth, Amtrak says that Plaintiff's declaration that "an Amtrak employee in a golf-cart immediately took me in the cart and I was taken to the emergency room," in Los Angeles is ambiguous and contradicts his deposition testimony that he rode in an ambulance. Thomson Decl. at ¶ 22. While Plaintiff did testify that he was in an ambulance at some point, the specific testimony that Amtrak points to shows that the parties were discussing Plaintiff's ambulance ride as a completely peripheral matter. The available record evidence indicates that Plaintiff's journey could have involved both a golf-cart and an ambulance. Rather than striking the declaration, Amtrak is free to cross-examine him about the circumstances of his arrival to the hospital.

Finally, Amtrak claims, with no legal analysis, that paragraphs 21 through 25 of Plaintiff's declaration are unsupported by objective evidence and that paragraphs 26 through 28 are Plaintiff's "interpretations of documents" – not the underlying document itself. ECF No. 109 at 6. Amtrak provides no discussion of why objective evidence is required in the first place or why Plaintiff's alleged interpretation of documents raises a sham issue of fact. The Court lacks

sufficient legal argument from Amtrak to meaningfully rule on its objections and the Court will

thus examine Plaintiff's declaration statements in ruling on the summary judgment motion.

### C. Amtrak's Motion to Strike Dr. Roback's Declarations

Amtrak moves to strike both of Dr. Roback's declarations, contending that they conflict

with his deposition testimony or are incomplete expert disclosures.

#### 1. Standard of Review

The Federal Rules of Civil Procedure require an expert's report to contain "a complete

statement of all opinions the witness will express and the basis and reasons for them." Fed. R.

Civ. P. 26(a)(2)(B)(i). "The purpose of rule 26(a) expert disclosures is 'not only to identify the

expert witness, but also 'to set forth the substance of the direct examination.'" *Guidance

Endodontics, LLC v. Dentsply Int'l, Inc.*, No. CIV 08-1101 JB/RLP, 2009 WL 3672502, at *3–4

(D.N.M. Sept. 29, 2009) (quoting *Jacobsen v. Deseret Book Co.,* 287 F.3d 936, 953 (10th

Cir.2002)). Under Fed. R. Civ. P. 37, "[i]f a party fails to provide information or identify a

witness as required by Rule 26(a) or (e), the party is not allowed to use that information or

witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was

substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). "[T]he determination of whether a

Rule 26(a) [or (e)] violation is justified or harmless is entrusted to the broad discretion of the

district court." *HCG Platinum, LLC v. Preferred Prod. Placement Corp.*, 873 F.3d 1191, 1200

(10th Cir. 2017) (citation omitted).

#### 2. Analysis

#### a. Dr. Roback's First Declaration

Amtrak seemingly requests that Dr. Roback's entire declaration be set aside. However,

the Court limits its analysis to the four portions of Dr. Roback's declaration that Amtrak claims

are new opinions: (1) Dr. Roback's statement that he "reviewed all relevant medical records," Roback Decl. at ¶ 5, (2) his statement that he reviewed Plaintiff's pre- and post-train incident medical records, "including imaging and x-rays" and that he was "aware that [Plaintiff] was … involved in an auto accident in 2009," *id*. at ¶ 12, (3) the doctor's statement that he "consider[ed] (and ultimately rule[d] out) other potential causes of [Plaintiff's] injuries and medical conditions, including but not limited to the auto accident," *id*. at ¶ 14, and (4) his ultimate opinion that to a "reasonably medical probability" Amtrak caused Plaintiff's injuries because "the significant issues [Plaintiff] complains of currently were not being experienced after the auto accident and prior to the Amtrak accident." *Id*. at ¶¶ 14, 15.

Categories 1 and 2 will not be excluded because Dr. Roback's expert report did list medical records that he deemed relevant, including x-ray and imaging records. In addition, he was aware of Plaintiff's 2009 car wreck. He wrote that Plaintiff's head, neck and back images were "normal," and noted "No injections, PT or DC. Treated less than 1 month." Roback Report at 10. Nor will categories 3 and 4, which are primarily the doctor's causation opinions, be excluded. Although Amtrak claims that it will be prejudiced if the declaration is considered because discovery will need to be reopened to examine the witness, the Court's review of Dr. Roback's first deposition shows that Amtrak adequately examined the doctor about the bases for his causation opinions and that the 2009 car wreck was a recurring topic of discussion. Amtrak's motion to strike Dr. Roback's first declaration is denied.

### b. Dr. Roback's Second Declaration

Amtrak moves to strike paragraph nine of Dr. Roback's second declaration in which the doctor stated: "During my experience in hospital administration and for the State, I have the knowledge, training, and experience to testify as to the costs of [Plaintiff's] future medical

treatment." 2nd Roback Decl. at ¶ 9. Although Amtrak characterizes this statement as either an incomplete expert disclosure or a sham declaration, it is actually a statement about the doctor's qualifications to testify as an expert, something which the Court determines as part of its gatekeeping function and is therefore better addressed in the Fed. R. Evid. 702 analysis *infra*.

### D. Expert Testimony

#### 1. Standard of Review

This is a diversity case, so the substantive law of the forum state, New Mexico, applies. *See Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 78 (1938). However, under *Erie*, federal law governs procedural issues, including disputes arising under the Federal Rules of Evidence. Federal Rule of Evidence 702 permits a qualified expert witness to give opinion testimony if:

• the expert's scientific knowledge would help the fact-finder understand the evidence,

• 'the testimony is based on sufficient facts or data,'

• 'the testimony is the product of reliable principles and methods,' and

• 'the expert has reliably applied the principles and methods to the facts of the case.'

*Hall v. Conoco Inc.*, 886 F.3d 1308, 1311 (10th Cir. 2018) (quoting Fed. R. Evid. 702).

"In evaluating the admissibility of expert testimony, 'the district court must satisfy itself that the proposed expert testimony is both reliable and relevant, in that it will assist the trier of fact, before permitting a jury to assess such testimony." *Schulenberg v. BNSF Ry. Co.*, 911 F.3d 1276, 1282 (10th Cir. 2018) (quoting *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (en banc)). This requires a two-step process. *See 103 Investors I, L.P. v. Square D Co.*, 470 F.3d 985, 990 (10th Cir. 2006). "First, the district court must determine whether the expert is qualified by knowledge, skill, experience, training, or education to render an opinion."

*Schulenberg*, 911 F.3d at 1282 (quotation marks omitted). "Second, if the expert is sufficiently qualified, the district court must determine whether the expert's opinion is reliable by assessing the underlying reasoning and methodology." *Id.* (quotation marks omitted).

Concerning reliability, a court should consider the following non-exhaustive and non-dispositive factors in determining whether particular expert scientific testimony is reliable: whether the expert's technique or theory can and has been tested; the theory has been subject to peer review and publication; the known or potential rate of error of the technique or theory when applied; the existence and maintenance of standards and controls; and the general acceptance of the methodology in the relevant scientific community. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149-50 (1999); *103 Investors I, L.P.*, 470 F.3d at 990. The Court's focus must be solely on the proposed expert's principles and methodology, not on the conclusions they generate. *See Daubert*, 509 U.S. at 595. The proponent of the expert bears the burden by a preponderance of the evidence to establish that the requirements for admissibility have been met. *Nacchio*, 555 F.3d at 1251.

**2. Analysis**

**a. Dr. Johnson's Causation Opinion is Excluded**

In its previous Memorandum Opinion and Order, the Court extensively detailed Dr. Johnson's background and experience, her expert report, declaration, and deposition testimony, all of which supported her diagnoses of TBI, Post-Traumatic Stress Disorder (PTSD) and Generalized Anxiety Disorder (GAD) and her hypothesis that the Amtrak incident caused these disorders. *See* ECF No. 155. The Court does not recite the facts from that Order, but instead fully adopts the entire Order herein.

Amtrak claims that Dr. Johnson did not render a "differential diagnosis" on the cause of Plaintiff's brain injury. ECF No. 169 at 5. "A differential diagnosis 'rule[s] in all scientifically plausible causes of the injury and then rule[s] out the least plausible causes until only the most likely cause remain[s].'" *Hall*, 886 F.3d at 1311 (quoting *Goebel v. Denver & Rio Grande W. Ry.*, 346 F.3d 987, 990 (10th Cir. 2003)) (alterations in original); *accord Hendrix ex rel. G.P. v. Evenflo Co.*, 609 F.3d 1183, 1195 (11th Cir. 2010) ("Differential [diagnosis] is a medical process of elimination whereby the possible causes of a condition are considered and ruled out one-by-one, leaving only one cause remaining.") "A reliable differential [diagnosis] analysis is performed in two steps." *Hendrix*, 609 F.3d at 1195. "First, the expert must compile a comprehensive list of hypotheses that might explain the set of salient clinical findings under consideration.... The issue at this point in the process is which of the competing causes are *generally* capable of causing the patient's symptoms." *Id.* (citations and quotation marks omitted) "Second, the expert must eliminate all causes but one." *Id.* (citation omitted).[4]

"In evaluating an expert's testimony, district courts may consider whether the expert has 'adequately accounted for obvious alternative explanations.'" *Taber v. Allied Waste Sys., Inc.*, 642 F. App'x 801, 810 (10th Cir. 2016) (quoting Fed. R. Evid. 702 committee note to 2000 amendment). "But an expert need not exclude every possible cause of an injury to testify as to causation." *Id.* at 810-11 (citing *Bitler*, 400 F.3d at 1238 n.6).

Instead, the expert need only exclude those alternative explanations that are 'obvious'—i.e., where there is 'an established connection between certain

---

[4] Amtrak says that the differential diagnosis standard is the "requisite methodology" needed to determine the specific cause of Plaintiff's TBI and Plaintiff accepted this standard for evaluating Dr. Johnson's process. ECF No. 169 at 5. "In the medical context, differential diagnosis is a common method of analysis, and federal courts have regularly found it reliable under *Daubert*." *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1237 (10th Cir. 2005). The Court therefore will assume that the differential diagnosis standard controls.

20

> possible causes and [the injury].' *Id.* If there is no evidence showing a possible alternative is valid, the expert's failure to rule it out does not render his diagnosis unreliable.

*Id.* But if "a defendant identifies a plausible alternative cause, it is 'necessary for the plaintiff's expert to offer a good explanation as to why his or her conclusion remains reliable.'" *Guinn v. AstraZeneca Pharm. LP*, 602 F.3d 1245, 1253 (11th Cir. 2010) (quoting *Kannankeril v. Terminix Int'l, Inc.,* 128 F.3d 802, 808 (3d Cir.1997)). "[A]n inference to the best explanation for the cause of an accident must eliminate other possible sources as highly improbable, and must demonstrate that the cause identified is highly probable." *Bitler,* 400 F.3d at 1238.

As noted, the Court previously ruled that Dr. Johnson is qualified to diagnosis TBI and associated cognitive impairments. But that conclusion does not by itself answer the reliability question because "[t]he ability to diagnose medical conditions is not … the same … as the ability to deduce … in a scientifically reliable manner, the causes of those medical conditions." *Gass v. Marriott Hotel Services*, Inc., 501 F. Supp. 2d 1011, 1019 (W.D. Mich. 2007), *rev'd on other grounds by Gass v. Marriott Hotel Servs., Inc.*, 558 F.3d 419 (6th Cir. 2009). "Doctors thus may testify to both, but the reliability of one does not guarantee the reliability of the other." *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 674 (6th Cir. 2010).

Such is the case here. Even if Dr. Johnson accurately diagnosed TBI, Plaintiff still has not presented sufficient evidence that Dr. Johnson reliably "ruled in" the potential causes of Plaintiff's TBI and "ruled out" alternative causes. Plaintiff was diagnosed with post-concussive syndrome (PCS) after a car wreck in 2009. Dr. Johnson was aware of the 2009 wreck. She understood that Plaintiff's only head injuries were from the 2009 accident and the 2014 Amtrak incident. *See* 2018 Depo. Of Dr. Julia M. Johnson, ECF No. 94-1, 130:23-25 – 131:1-6 (2018

Johnson Depo.). When asked about what role the 2009 car wreck would play in his condition,

Dr. Johnson testified that the accident was not part of her evaluation because she

> saw that the PCS was noted … It was then gone, and that was consistent with
> what he had shared with me about a motor vehicle accident, and it was no longer
> noted in his medical records to corroborate what he was saying. So, therefore, this
> examination was based on where he was when I assessed him on that date.

*Id*. at 64:15 – 25 – 65:1.

However, Amtrak tendered pre-train incident medical records from Redwoods Rural

Health Center (Redwoods Rural) in California showing that TBI was listed as a chronic

condition in Plaintiff's medical file in the months before the train incident. In March 2014,

Plaintiff sought treatment at Redwoods Rural many times. He was depressed and his medical file

noted that he was "under a tremendous amount of stress and his coping has been comprised [sic]

by head injury her [sic] received five years ago in an accident." ECF No. 169-3, 1. During a

March 17 visit, he told the provider that he "incurred a TBI as a result of a MVA" and that

"[s]ince incurring head trauma" he had experienced "chronic head paid, nausea, dizziness, ear

aches, loss of time …." ECF No. 169-4, 2. A March 31 medical record states that Plaintiff "[h]ad

a traumatic brain injury in 2009." ECF No. 169-5, 1. Again, his medical records from this period

consistently listed TBI as a "chronic condition."

When asked during her deposition about the significance of Plaintiff's Redwoods Rural

files, Dr. Johnson maintained that the PCS diagnosis "was medically released in reports and [that

he] recovered from it fully." 2020 Depo. Of Dr. Julia M. Johnson, ECF No. 169-1, 56:14-15

(2020 Johnson Depo.). But Plaintiff has not pointed the Court to his medical files showing that

he recovered. Nor could Dr. Johnson identify them when asked. The Redwoods Rural files,

however, are in the record and they show that TBI was listed as a chronic condition right before

the train accident. Plaintiff in fact acknowledges that "other doctors and psychologist previously

determined that [Plaintiff] had a TBI." ECF No. 94 at 7. Yet there is no mention by Dr. Johnson of how Plaintiff's prior TBI diagnosis affected her causation opinion even though TBI has persisted in Plaintiff's medical history.

The doctor's testimony makes clear, then, that she is offering a general opinion about Plaintiff's condition at the time of her evaluation and assumed that it was attributable to the train accident. The doctor's sole justification for "ruling out" the 2009 accident was simply that Plaintiff had recovered, and PCS disappeared from his medical files. However, in performing the "ruling out" requirement, the expert "must provide a reasonable explanation as to why he or she has concluded that [any alternative cause suggested by the defense] was not the sole cause." *Best v. Lowe's Home Centers, Inc.*, 563 F.3d 171, 179 (6th Cir. 2009) (citation omitted) (alteration in original); *see id.* ("The core of differential diagnosis is a requirement that experts at least consider alternative causes.") It may have been natural to assume that Plaintiff's TBI was attributable to the train accident. But "[t]he courtroom is not the place for scientific guesswork," and the doctor would be unable to reliably defend her conclusion at trial. *Goebel*, 346 F.3d at 1002. Dr. Johnson's proffered testimony that Amtrak caused Plaintiff's TBI is excluded.

### b. Dr. Roback's Causation Opinion About Plaintiff's Right Shoulder Injury is Admissible. The Remainder of Dr. Roback's Proffered Medical Causation Testimony is Excluded

Amtrak moves to exclude Dr. Roback's causation opinion.[5] First, Amtrak analogizes this case to *Magbegor v. Triplette*, 212 F. Supp. 3d 1317, 1328 (N.D. Ga. 2016), a car-wreck case, where the district court excluded an orthopedic surgeon's causation testimony partially because the surgeon "conducted no independent inquiry about the automobile accident that [p]laintiff told

---

[5] Amtrak does not challenge Dr. Roback's qualifications to render a medical causation opinion so the Court only analyzes the reliability of the doctor's medical causation opinions. Amtrak does, however, challenge his qualifications to testify about medical damages, which the Court separately analyzes.

him resulted in the shoulder injury," such as "the speed at which the vehicles were traveling, the violence of the impact, the direction bodies may have moved, and the positioning of Plaintiff within the car." The Court agrees that Dr. Roback demonstrated a lack of understanding of the basic facts of the incident. When asked how Plaintiff's shoulder was injured, Dr. Roback described the accident as consisting of "two accidents": Plaintiff "fl[ew] forward" and hit his head on a door and then "the secondary part of it … is the toilet ends up on him." Roback Depo. 92:12-13, 16-17. But then he stated, apparently based on nothing more than guesswork, that "[i]t could have happened there where he hit the door and the toilet didn't end up on him and he could have been hit by the toilet and not hit the door." *Id*. at 92:18-21. Concerning Plaintiff's back injury, the doctor deposed that the detached toilet landed on Plaintiff's torso – even though Plaintiff testified that the toilet was partially on top of his legs – and that it was "more likely whatever problems he had with his back came from the toilet landing on him than his hitting the door." *Id*. 135:10-11; Thomson Depo. 141:10. But Dr. Roback did not know where the toilet landed. He acknowledged as much in his deposition and said that he did not ask Plaintiff where the toilet came to rest. Roback Depo. at 134:11-19. Although Dr. Roback's lack of knowledge with some of the facts of the incident does not alone justify excluding his testimony, it does tend to undermine the reliability of his methodology.

Amtrak also contends that Dr. Roback's specific causation opinion is unreliable because, like Dr. Johnson, he did not perform a differential diagnosis that took account of Plaintiff's preexisting medical history. The Court agrees, in part. While Dr. Roback took the important steps of physically examining Plaintiff and reviewing his medical history, his expert report provides no insight as to what his differential diagnosis entailed. In the "Impressions/Diagnoses" portion of his report, the doctor described "chronic, symptomatic, posttraumatic" injury or

derangement based on abnormal findings from x-ray or MRI images, most of which were produced after the train incident. Roback Report at 26-28. However, it is not clear from reading Dr. Roback's report if he attributed Plaintiff's present condition to the Amtrak incident by comparing x-ray and MRI images from before and after the incident. In addition, nowhere in Dr. Roback's report does it show that he considered and ruled out other potential causes of Plaintiff's current pain. It appears from his report that he simply attributed the accident the Amtrak, rather than compiling a comprehensive list of possible causes which he then "systematically and scientifically rul[ed] out ... until a final, suspected cause remain[ed]." *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1342 (11th Cir. 2010). The doctor's report therefore shows that his methods did not meet the relevant reliability standards. *See, e.g., Kudabeck v. Kroger Co.*, 338 F.3d 856, 861 (8th Cir. 2003) (concluding that expert's differential diagnosis was valid where he ruled out other causes of plaintiff's degenerative disc disease, including infection, arthritis, and genetic causes); *Hardyman v. Norfolk & W. Ry. Co.*, 243 F.3d 255, 261 (6th Cir. 2001) (holding that expert performed a proper differential diagnosis where he "took an extensive history of [p]laintiff's non-occupational work activities," including bowling, golf, and other actives and specifically explained in his expert report why those activities were not causes of plaintiff's carpal tunnel syndrome).

It is therefore necessary to review Dr. Roback's deposition testimony to determine if he employed the requisite intellectual rigor to support his conclusions. Plaintiff points the Court to Dr. Roback's testimony that Plaintiff's disc herniation was not caused by his age or weight and the doctor's testimony that the 2017 MRI of Plaintiff's right shoulder showed serious damage and a newer injury that was trauma derived. But this only shows that Dr. Roback ruled in possible causes for Plaintiff disc herniation and a right shoulder injury. Plaintiff points to no

25

other testimony where Dr. Roback discussed ruling in possible causes of the remainder of Plaintiff's injuries. The doctor therefore did not "eliminate other possible sources as highly improbable, and … demonstrate that the cause identified [by the expert] is highly probable." *Bitler,* 400 F.3d at 1238.

Concerning back injuries in particular, even if Dr. Roback considered and ruled out Plaintiff's age or weight as causes of disc herniation, his methodology is still unreliable because it appears that he did not consider how pre-train incident medical records noting back problems affected his causation analysis. Those records noted back pain, a bulging disc in Plaintiff's spine, and the "diagnosis" section of Plaintiff's May 1, 2014 record stated: "[Herniated Nucleus Pulposus] Lumbar Spine" and "(R) Clavicular Pain." Def.'s Ex. 11, ECF No. 88-11; Def's. Ex. 9, ECF No. 88-9, 1; Def.'s Ex. 10, ECF No. 88-10. Amtrak states that one of these records shows that "Plaintiff was diagnosed with pre-existing back problems." ECF No. 88 at 6. Yet, Dr. Roback did not adequately discuss how these pre-train incident medical records showing back issues affected his causation analysis. And as discussed earlier, Dr. Roback attributed Plaintiff's back problems with the toilet striking his torso, even though Plaintiff testified that the toilet was partially on top of his legs, further casting doubt on the reliability of Dr. Roback's conclusions.

Dr. Roback may, however, testify about the injury to Plaintiff's right shoulder. Dr. Roback stated that the 2017 MRI images showed serious damage and fluid in the joint area, an indication of a newer injury. He also concluded that the injury was traumatic in origin because Plaintiff did not play certain sports or a work a job that put him at risk for traumatic injury. This shows that Dr. Roback considered which alternative causes should be ruled in, and which could be ruled out. Although Amtrak points out that 2008, 2009, and 2014 medical records note shoulder issues, those issues do not appear to be as extensive as some of Plaintiff's other medical

26

problems. The Court's focus at this stage is "solely on principles and methodology," rather than Dr. Roback's specific conclusions. *Daubert*, 509 U.S. at 595. Given that Dr. Roback properly considered alternative potential causes of Plaintiff's right shoulder injury and determined that the injury was likely newer and trauma-based, Dr. Roback used a reliable differential diagnosis. So long as his methodology reflects a reliable practice, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* at 596. Any perceived defects that Amtrak highlights, such as the doctor's lack of knowledge of the incident or his alleged incomplete review of Plaintiff's medical records may be explored during cross-examination of the witness.

Finally, Dr. Roback's testimony about Plaintiff's right shoulder injury would assist the trier of fact. "In assessing whether testimony will assist the trier of fact, district courts consider several factors, including whether the testimony is within the juror's common knowledge and experience and whether it will usurp the juror's role of evaluating a witness's credibility." *United States v. Gutierrez de Lopez*, 761 F.3d 1123, 1136 (10th Cir. 2014) (quotation and citation marks omitted). The alleged cause of Plaintiff's right shoulder injury is not a matter within a juror's common knowledge given Plaintiff's medical history and therefore the doctor's testimony will be relevant.

### c. Dr. Roback Has the Qualifications and Methodology to Opine About Plaintiff's Medical Damages and His Testimony Will Assist the Jury

Dr. Roback is qualified to testify about Plaintiff's medical damages concerning injury to Plaintiff's right shoulder. He is a doctor with almost fifty years of experience practicing medicine and has held senior hospital positions. His service on California's industrial medical council and involvement in the State's workers' compensation divisions has given him

27

experience in issues related to medical costs. In addition, Dr. Roback's experience as chief orthopedic exposed him to billing issues. June 2020 Roback Depo. at 43:8-9. That he has "never worked in hospital billing," *id*. at 44:7, or that his billing knowledge may be outdated goes to the weight of his testimony rather than its admissibility. "[A]s long as an expert stays within the reasonable confines of his subject area, … a lack of specialization does not affect the admissibility of [the expert] opinion, but only its weight." *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 970 (10th Cir. 2001) (quotation marks and citation omitted). Courts, including this one, have held that "a doctor can testify about future medical expenses." *Morales v. E.D. Etnyre & Co.*, 382 F. Supp. 2d 1273, 1277 (D.N.M. 2005); *Dominguez v. Lubbock*, No. CIV-11-1347-R, 2013 WL 5815730, at *2 (W.D. Okla. Feb. 1, 2013) ("Courts have consistently held that orthopedists are qualified to render opinion as to a plaintiff's future prognosis, including the permanency of his or her injuries, whether he or she would be able to return to work and the need for physical therapy and/or pain medications.") Dr. Roback is qualified to opine on Plaintiff's right shoulder medical damages.

Dr. Roback's damages opinions are reliable. He testified that in his role as a chief orthopedic he would occasionally review and is generally familiar with charges for treatments. June 2020 Roback Depo. at 43:8-25-44:1-25. He further testified that his estimates were based on the "average or center of the bell [shaped curve]" for a similar treatment. *Id*. at 54:9-10. Dr. Roback's opinions are based on his "specialized knowledge" as an orthopedic surgeon familiar and he is familiar with orthopedic injuries and their treatment. Fed. R. Evid. 702. His testimony will help the trier of fact given that courts have found testimony by orthopedic surgeons relevant to determining future medical treatment. *See Morales*, 382 F. Supp. 2d at 1277; *Dominguez*, 2013 WL 5815730, at *2.

**E. Summary Judgment**

**1. Standard of Review**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. At the summary judgment stage a court must "view facts in the light most favorable to the non-moving party and draw all reasonable inferences in [his] favor." *Leone v. Owsley*, 810 F.3d 1149, 1153 (10th Cir. 2015). "A fact is 'material' if, under the governing law, it could have an effect on the outcome of the lawsuit. A dispute over a material fact is 'genuine' if a rational jury could find in favor of the nonmoving party on the evidence presented." *Id.*

When "the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Cassara v. DAC Serv., Inc.*, 276 F.3d 1210, 1212 (10th Cir. 2002). "After the moving party has identified a lack of a genuine issue of material fact, the nonmoving party has the burden to cite to specific facts showing that there is a genuine issue for trial." *Ezell v. BNSF Ry. Co.*, 949 F.3d 1274, 1278 (10th Cir. 2020) (internal quotation marks and citations omitted). "The nonmoving party must be specific to satisfy its burden, either by 'citing to particular parts of materials in the record' or by showing that the moving party has relied on insufficient or inadmissible evidence." *Id.* (citing Fed. R. Civ. P. 56(c)(1)(A)–(B)).

**2. Analysis of the Causation Element of Plaintiff's Negligence Claim**

**a. Plaintiff Lacks Causation Evidence in Support of His Non-Shoulder Injuries**

Plaintiff asserts a single claim for relief for negligence. "A negligence claim requires that the plaintiff establish four elements: (1) defendant's duty to the plaintiff, (2) breach of that duty,

typically based on a reasonable standard of care, (3) injury to the plaintiff, and (4) the breach of

duty as cause of the injury." *Zamora v. St. Vincent Hosp.*, 2014-NMSC-035, ¶ 22, 335 P.3d

1243, 1249.[6] Concerning the causation element, "[i]n New Mexico, as is universally the case, a

tort plaintiff must demonstrate the defendant's actions caused the plaintiff's injury. *Wilcox v.*

*Homestake Mining Co.*, 619 F.3d 1165, 1166 (10th Cir. 2010). "To establish liability, there must

be a chain of causation initiated by some negligent act or omission of the defendant, which in

legal terms is the cause in fact or the 'but for' cause of plaintiff's injury." *Chamberland v.*

*Roswell Osteopathic Clinic, Inc.,* 2001-NMCA-045, ¶ 18, 27 P.3d 1019, 1023.

"Although federal law governs whether [Plaintiff] presented sufficient evidence of

causation to defeat summary judgment, state law governs what theories of causation are

permissible and the general means permitted to establish causation." *Hall*, 886 F.3d at 1316 &

n.6. The Court has described New Mexico's law on the necessity of medical expert testimony as

follows:

> New Mexico case law, while not always clear in this area, appears to indicate the
> following. First, 'in many cases expert testimony will be required to establish
> [medical] causation.' *Folz v. State,* 797 P.2d 246, 260 (N.M.1990); *see also*
> *Buchanan v. Downing,* 394 P.2d 269, 272 (N.M.1964) ('[E]xpert testimony is
> generally required to establish causal connection.' (citation omitted)); *State v.*
> *Newman,* 784 P.2d 1006, 1013 (N.M.App.1985) (Hartz, J., specially concurring)
> ('[C]ourts ordinarily do not permit juries to draw a conclusion regarding ...
> medical causation without expert testimony directly supporting the conclusion.')
> …. This general rule is in place because 'the cause and effect of a physical

---

[6] Amtrak's duty of care to Plaintiff is undisputed. Amtrak states that as a common carrier of
passengers for hire it is obligated to "exercise the highest degree of care in promoting the safety
of its passengers," ECF No. 90 at 9. Plaintiff accepted this standard. Even though the parties
assume that this elevated duty of care applies, the Court notes that New Mexico's jury instruction
states that common carriers owe only a duty of ordinary care to their passengers. N.M.R.A., Civ.
U.J.I. § 13-605 ("The defendant as a common carrier has a duty to exercise ordinary care for the
safety of its passengers and their property."); *see also Monasterio v. Greyhound Lines, Inc.*, No.
215CV00683PJKSMV, 2019 WL 318389, at *3, n.4 (D.N.M. Jan. 24, 2019). The governing rule
thus appears to be of ordinary care under § 13-605.

condition lies in a field of knowledge in which only a medical expert can give a competent opinion.' *Woods v. Brumlop,* 377 P.2d 520, 523 (N.M.1962).

Having said that, 'such [expert] testimony is not always necessary' to establish medical causation. *Folz,* 797 P.2d at 260. This is especially the case 'where exceptional circumstances within common experience or knowledge of the layman are present.' *Cervantes v. Forbis,* 389 P.2d 210, 213 (N.M.1964) …. In determining whether an expert is required, or whether 'exceptional circumstances' exist, New Mexico trial courts utilize a reasonableness standard; that is, a plaintiff is required to produce an expert 'when the trial court reasonably decides that it is necessary to properly inform the jurors on the issues.' *Folz,* 797 P.2d at 260 (citing *Gerety v. Demers,* 589 P.2d 180, 195 (N.M. 1978)).

*Duke v. Garcia*, No. 11-CV-784-BRB/RHS, 2014 WL 1333151, at *1–2 (D.N.M. Feb. 28, 2014).

The cause of traumatic brain injury and certain orthopedic injuries is not a matter within the common experience of laypersons. Expert testimony is therefore needed to deduce the cause of such ailments, especially given Plaintiff's long and complex medical history. *See id*. at *3 ("actions involving medically complicated injuries require expert testimony on causation.") (citation and quotation marks omitted). Without the proposed testimony by Drs. Johnson and Roback, Amtrak is entitled to summary judgment on Plaintiff's allegation that the train accident caused his non-shoulder injuries.

### b. *Res Ipsa Loquitur* Applies to Plaintiff's Right Shoulder Injury

Amtrak moved for summary judgment that Plaintiff cannot prove negligence by relying on the doctrine of *res ipsa loquitur*. Normally, "the mere fact that an accident occurred is not grounds for concluding that a particular defendant was probably negligent." *Drake v. Trujillo*, 1996-NMCA-105, ¶ 25, 924 P.2d 1386, 1391. However, the doctrine of *res ipsa loquitur*, meaning the incident "speak[s] for itself," *Strong v. Shaw*, 1980-NMCA-171, ¶ 10, 629 P.2d 784, 786, "applies only when evidence establishes that in the ordinary course of events an injury would not occur except through negligence of the person in exclusive control and management of the injuring instrumentality." *Trujeque v. Serv. Merch. Co.*, 1994-NMSC-036, ¶ 6, 872 P.2d

361, 364 (citation omitted). "The ordinary course of events may be established by expert testimony, lay evidence, or common knowledge." *Romero v. Truchas Mut. Domestic Water Consumer & Mut. Sewage Works Ass'n*, 1995-NMCA-125, ¶ 8, 908 P.2d 764, 767*, overruled on other grounds by Spectron Dev. Lab'y, a Div. of Titan Corp. v. Am. Hollow Boring Co.*, 1997-NMCA-025, ¶ 8, 936 P.2d 852.

> To establish an inference of negligence, there must be proof that
>
> (1) plaintiff's injury was proximately caused by an agency or instrumentality under the exclusive control of the defendant; and (2) the incident causing the injury is of the kind which ordinarily does not occur in the absence of negligence by the person having control of the instrumentality.

*Hisey v. Cashway Supermarkets, Inc.*, 1967-NMSC-081, ¶ 4, 426 P.2d 784, 785.

"The burden of proving the presence of both elements rests on the plaintiff." *Akin v. Berkshire*, 1973-NMCA-106, ¶ 8, 512 P.2d 1261, 1262. Once the plaintiff establishes these two prongs, he has carried his "burden of making a prima facie case from which the jury could infer negligence." *Trujeque*, 1994-NMSC-036 at ¶ 11. The defendant can "then choose to present no evidence or choose to rebut the inference by offering evidence that a latent manufacturing defect was the cause" of the injury "or perhaps that some third party bore responsibility" for the injury, or point to "other causes for which he was not responsible." *Id.* (citation omitted). A successful *res ipsa loquitur* showing simply creates an inference which the trier of fact may choose to accept or reject. *Shaw*, 1980-NMCA-171 at ¶ 18.

The Seventh Circuit's decision in *Smith v. United States*, 860 F.3d 995 (7th Cir. 2017) is useful to analyzing this case. In *Smith,* a prisoner fell from a wobbly stool in an attorney interview room within an Indiana federal courthouse. *Id*. at 996. After he fell, he saw bolts missing from the stool's underside. *Id*. at 997. Indiana, like New Mexico, permits an inference of negligence if an injury would not normally occur absent negligence and the agency or

instrumentality causing injury was within the defendant's control. *Id.* at 998. The court held that the plaintiff established the first element of *res ipsa loquitur* because a "properly functioning stool … should not wobble so as to tip its occupant onto the floor," and a "malfunctioning stool … which would pose a hazard to anyone using the stool—points to negligence." *Id*. at 999.

The "control" element was also met because "[t]he stool was within a room maintained and controlled" by US Marshals who inspected the room and equipment on weekly basis. *Id*. at 996, 999-1000. Even if the plaintiff "and other detainees regularly used the room (and likely had done so on the day Smith was injured) and may themselves have been responsible for the alleged malfunctioning of the stool," the defendant maintained exclusive control over the room and equipment. *Id.* at 1000. The "key question" was "whether the probable cause of the plaintiff's injury was one which the defendant was under a duty to the plaintiff to anticipate or guard against." *Id.* (citations omitted). "If indeed the stool malfunctioned," then the defendant "was under a duty to anticipate and guard against [it]." *Id*.

The evidentiary record, properly construed in Plaintiff's favor, shows that the evidence satisfies the "exclusive control" element. *Hisey*, 1967-NMSC-081 at ¶ 4. Like the stool in the courthouse controlled by agents, the toilet was within a room maintained and controlled by Amtrak. Amtrak exercises control over the sleeper by ensuring that it is secure for its passengers. Its employees, out of safety concerns, inspect the lavatories, and did so on the day that Plaintiff boarded the train. *See Smith*, 860 F.3d at 1000 (control established where "[t]he government … admits that it inspects the equipment, including the stool, on a regular basis.")

Amtrak suggests that Plaintiff or "other individuals who had access to the room," ECF No. 90 at 14, could have been involved in the toilet shroud's detachment. But a toilet shroud that is normally bolted down and in a private cabin is quite unlike an airplane tray table that can

hypothetically be accessed and tampered with by anyone. *Cf. Earley v. United Airlines*, No. 2:05-CV-0835, 2006 WL 2794971, at *6 (S.D. Ohio Sept. 28, 2006) (airline did not exclusively control a tray table that became unlatched because of "the possibility that someone other than United also exercised control of the tray table or latch" – i.e., another passenger or employee could have tampered with the latch during boarding or when the plaintiff got up to use the restroom). Amtrak neglects to answer the "[t]he essential question" concerning "control" – namely, "whether the probable cause [of Plaintiff's injury] is one which the defendant was under a duty to the plaintiff to anticipate or guard against." *Mireles v. Broderick*, 1994-NMSC-041, ¶ 18, 872 P.2d 863, 870. Amtrak was under a duty to anticipate and guard against a malfunctioning toilet, as evidenced by its inspections of the sleeper unit, such that the question of exclusive control should go to the jury.

The second factor – the injury would not ordinarily would not occur absent negligence – could also be found by the jury. The Court fully credits as true Plaintiff's statements that he "never altered, manipulated, unscrewed, or did anything to the toilet" or "tamper with the toilet in any way." Thomson Decl. at ¶ 11. He also submitted repair orders from before and the day of the accident which – telling – indicated toilet shroud issues. Just as a "properly functioning stool … should not wobble so as to tip its occupant onto the floor," a toilet shroud should not detach from its moorings. *Smith*, 860 F.3d at 999. Conflicting inferences to be drawn from the evidence – such as Amtrak employees' statements that they had never seen a toilet shroud detach – are to be weighed by the factfinder.

Finally, a jury could find that Amtrak's alleged negligence proximately caused Plaintiff's right should injury. *See Renfro v. J. D. Coggins Co.*, 1963-NMSC-014, ¶ 18, 378 P.2d 130, 135 (explaining that *res ipsa loquitur* cannot be used to establish proximate cause). Proximate cause

refers to "whether and to what extent the defendant's conduct foreseeably and substantially caused the specific injury that actually occurred." *Lujan v. New Mexico Dep't of Transp.*, 2015-NMCA-005, ¶ 35, 341 P.3d 1, 10 (citation omitted). "An act or omission may be deemed a proximate cause of an injury if it contributes to bringing about the injury, if the injury would not have occurred without it, and if it is reasonably connected as a significant link to the injury." *Id.* (citation and quotation marks omitted). "Determining proximate cause is a question of fact for the jury." *Id.* Amtrak states that the alleged incident was unforeseeable because it "is unaware of any [similar] incident." ECF No. 90 at 11. However, given Plaintiff's evidence that the toilet shroud was loose in the past, a reasonable juror could find that Amtrak knew of the malfunction and that the defect began a natural or continuous sequence that caused Plaintiff's injury.

In summary, the evidentiary record could permit the factfinder to infer negligence on the part of Amtrak. This ruling, however, is limited to Plaintiff's alleged right shoulder injury. "*Res ipsa loquitur* is used to establish negligence, not injury or cause." *Harvey v. United States*, 685 F.3d 939, 953 (10th Cir. 2012) (concluding that *res ipsa loquitur* could not establish causation where plaintiff's medically complex injuries were not within the "common knowledge among laymen" and required expert causation testimony); *Renfro*, 1963-NMSC-014 at ¶ 18. Because Plaintiff has not adduced reliable expert medical evidence that Amtrak caused his non-shoulder injuries, *res ipsa loquitur* does not allow him to establish causation for those injuries. Plaintiff may present Dr. Roback's testimony for the narrow purpose of opining on Plaintiff's right shoulder injury and accompanying medical damages. *See Romero*, 1995-NMCA-125 at ¶ 8 ("The ordinary course of events may be established by expert testimony, lay evidence, or common knowledge.")

### 3. Punitive Damages

Amtrak moves for summary judgment on Plaintiff's claim for punitive damages. To be liable for punitive damages, a tortfeasor must have a culpable mental state. *Paiz v. State Farm Fire & Cas.*, 1994-NMSC-079, ¶ 24, 800 P.2d 300, 307. "[S]uch damages are appropriate only when the wrongdoer's conduct may be said to be maliciously intentional, fraudulent, oppressive, or committed recklessly or with a wanton disregard of the plaintiffs' rights." *Martin v. Comcast Cablevision Corp. of California, LLC*, 2014-NMCA-114, ¶ 17, 338 P.3d 107, 112. Since punitive damages are assessed for punishment and not for reparation, a positive element of conscious wrongdoing is always required. *Paiz*, 1994-NMSC-079 at ¶ 27.

Plaintiff submitted no summary judgment evidence that he believed Amtrak acted culpably, despite to his claim to the contrary, making him similar to the plaintiff in *Behrens v. Gateway Ct., LLC*, 2013-NMCA-097, ¶ 23, 311 P.3d 822, 831 (punitive damages unavailable to a mobile home tenant who deposed "that she did not believe that [d]efendant intentionally set the fire or allowed any unsafe conditions in the mobile home[.]") Plaintiff instead relies on Amtrak's alleged "failure to properly inspect, install, maintain, and/or replace … the toilet." *Id.* However, "unsafe features in [the d]efendant's [business] do not give rise to an inference [of] reckless[ness]." *Id.* (quoting *Couch v. Astec Indus., Inc.*, 2002-NMCA-084, ¶ 60, 53 P.3d 398, 411 (punitive damages unavailable to plaintiff even though he introduced evidence that his employer did not follow safety plans or keep safety records and did not implement a product safety program)) (second alteration added). The doctrine of *res ipsa loquitur*, even if resolved in Plaintiff's favor, amounts to negligence at the most. Summary judgment is entered in favor of Amtrak on Plaintiff's punitive damages claim.

IV.    **CONCLUSION**

Plaintiff failed to establish sufficient indicia of reliability of Dr. Johnson's opinion that Amtrak caused Plaintiff's cognitive injuries and Dr. Roback's opinion that Amtrak caused Plaintiff's orthopedic injuries – except for Dr. Roback's opinion that Amtrak injured Plaintiff's right shoulder. In the absence of expert testimony, Plaintiff cannot prove that Amtrak caused his non-shoulder injuries and Amtrak is entitled to judgment as a matter of law on those allegations. Amtrak is also entitled to summary judgment on Plaintiff's punitive damages claim. The Court will by separate order set trial for a jury to determine Plaintiff's claim that Amtrak caused his right shoulder injury. At trial, Plaintiff may admit Dr. Roback's causation and damages testimony concerning Plaintiff's right shoulder injury. Plaintiff will also be entitled to a jury instruction that the jury may draw an inference of negligence.

**IT IS THEREFORE ORDERED that** Defendant National Passenger Corporation's (Amtrak) Motion to Exclude the Testimony of Dr. Julia Johnson, EDD, LEP **(ECF No 87)** and Amended Motion to Exclude the Testimony of Dr. Julia M. Johnson Regarding Causation **(ECF No. 169)** are **GRANTED**;

Amtrak's Motion to Exclude the Testimony of Dr. Michael D. Roback, M.D. **(ECF No. 88)**; Amtrak's Renewed Motion to Exclude Dr. Michael D. Roback, M.D.'s Supplemental Orthopaedic Report and Corresponding Testimony **(ECF No. 162)**; Amtrak's Motion to Strike Plaintiff's Declaration, as moved for in **(ECF No. 109)**; and Amtrak's Motion for Summary Judgment **(ECF No. 90)** are **GRANTED in part** and **DENIED in part**;

Amtrak's Motion to Strike Dr. Roback's Declaration as moved for in **(ECF No. 103)**; Amtrak's Motion to Strike Dr. Roback's Second Declaration **(ECF No. 167)**; and Plaintiff's Federal Rule of Civil Procedure 56(d) Motion as moved for in **(ECF No. 99)** are **DENIED**.

**IT IS SO ORDERED**.

_____
SENIOR UNITED STATES DISTRICT JUDGE